Wilson, Paul D., J.
In this lawsuit, Plaintiff Andrew Segal, M.D. sued his former employer Genitrix, LLC, as well as several persons associated with Genitrix. When the case reached trial, after years of litigation in Delaware and in Massachusetts (which included trips to the appellate courts of both states), Segal’s only remaining claims were his Wage Act claims against Defendants H. Fisk Johnson, III and Stephen Rose. In those claims, Segal contended that Johnson and Rose were “officers or agents having the management” of Genitrix, and therefore were personally liable to him for his unpaid wages under M.G.L.c. 149, §148.
I presided over an eight-day jury trial on these claims in November 2015. The jury returned a verdict in favor of Plaintiff in the total amount of $398,892. Because the legislature amended the Wage Act as of July 12, 2008 to make treble damages mandatory, and the period of unpaid damages began before that date, the jury verdict slip asked the jury to break the damages down into amounts attributable to the period before July 12, 2008, as to which the jury awarded $231,250, and the period July 12, 2008 and thereafter, as to which the jury awarded $167,642.
Prior to the amendment making treble damages mandatory, Wage Act damages were trebled if the defendant’s conduct was “outrageous, because of the defendant’s evil motive or his reckless indifference to the rights of others. ” Wiedman v. The Bradford Group, Inc., 444 Mass. 698, 710 (2005), quoting Dartt v. Browning-Ferris Industries, Inc. (Mass.), 427 Mass. 1, 17a (1998). Evidence of “outrageous” behavior relating to “evil motive or... reckless indifference” was relevant only to the trebling question, and such evidence might have unfairly prejudiced Johnson and Rose as the jury decided their liability. Therefore I bifurcated the trial, reserving to myself the obligation to decide, if necessary, whether the evidence justified trebling of pre-July 12, 2008 Wage Act damages under the Wiedman standard.
On December 22,2015, without ajury, I presided over the second phase of the trial, concerning this question. The only live witness during the second phase was Segal, but the parties also introduced deposition testimony of Johnson, Rose, and David Ford, the accountant who liquidated Genitrix after being appointed for that purpose by the Delaware Chancery Court.
At the conclusion of the evidence, I established a schedule for post-trial briefing, which contemplated that such briefing would be concluded in late January. However, the parties continued to file additional motions and briefs, most recently a sur-reply memorandum filed on June 1, 2016.
I base my Findings of Fact and Rulings of Law on the live testimony and deposition testimony presented during both phases of the trial, as well as the 80 exhibits introduced during the two phases of the trial.
Findings of Fact
Based on all the credible evidence, and the reasonable inferences drawn from that evidence, I find the following facts.
In the late 1990s, Segal, a physician-scientist, was doing cancer research. He was attempting to develop a molecule that would teach the immune system to attack cancer cells. He developed some intellectual properly, including patents, in this area, and he now began seeking investors to fund further development of his research. As result of a program at the Massachusetts Institute of Technology that connected scientists with investors and entrepreneurs, Segal made contact with representatives of Johnson, who was the Chief Executive Officer of a very large family company. Johnson was using some of his own money to invest as venture capital. Rose, an employee of the “family office” of the Johnson family, oversaw those investments for Johnson.
A long negotiation ensued, in which both Segal and Johnson were represented by competent counsel. The result was the formation of Genitrix, a Delaware limited liability corporation formed by Segal and Johnson on September 11, 1997. Genitrix had other members, brought to the entity by both Segal and Johnson, but their ownership interests were small compared to the interests of Johnson and Segal. Segal contributed intellectual properly to Genitrix which the parties valued at $500,000, but no cash. Johnson contributed most or all of the initial cash capital.
The governing body of Genitrix was the Board of Member Representatives (the “Board”). Segal and Johnson each had the right to appoint two members of the Board. Segal appointed himself as one of his representatives on the Board, and served in that role until Genitrix was dissolved. Johnson appointed himself as one of his two representatives on the Board, a position he gave up about two years later. Throughout most or all of the history of Genitrix, Rose served on the Board as one of J ohnson’s representatives. All parties to this lawsuit understood that Rose, who was much *459 more active at Genitrix than Johnson, spoke for Johnson in dealing with Segal and Genitrix. In fact, Johnson so informed Segal in writing as to at least one issue.
On the day Genitrix was formed, Segal signed an employment agreement with Genitrix, which made him the Chief Executive Officer, at an annual salary of $75,000. (In July 2003, the Genitrix Board increased Segal’s salary to $150,000.) The agreement provided that Segal could be terminated for cause by a vote of 50 percent of the Board (that is, by the Johnson Board members alone), or without cause by a vote of 75 percent of the Board. Johnson was expressly deemed to be a third-party beneficiary of the employment agreement, and the agreement granted him the authority personally to enforce the rights of Genitrix under the agreement
For Genitrix, Segal worked on furthering his research program, with the assistance of a small scientific staff. There is no evidence that Segal actually worked in the laboratory, but I infer that he directed the work of others. Based on undisputed testimony, I find that Segal was in charge of filing additional patent applications, and in dealing with the United States Patent & Trademark Office to respond to issues raised there so as to have new Genitrix patents issued, and in keeping existing patents alive through regular filings and payment of fees. Segal was successful in expanding the patent holdings of Genitrix.
In 2003, Johnson invested additional funds in Genitrix through an entity he controlled called Fisk Ventures, LLC. Fisk Ventures made its investment through a Note Purchase Agreement with Genitrix. When Genitrix failed to achieve financing milestones required by that agreement, the convertible debt held by Fisk Ventures became an equity interest in Genitrix in early 2007, entitling Fisk Ventures to its own Board representative. As result, Johnson gained the ability to control the appointment of three members of a five-member Genitrix Board, giving him effective control of many corporate actions. However, the most dramatic corporate actions required a supermajority greater than Johnson’s 60% control of the Board.
By 2006, the parties were unhappy with one another. They began to discuss restructuring their relationship. One possibility was that Segal might buy out the Johnson interests. In the course of these negotiations, Bill Freund, one of the Board members appointed by Johnson, stated in writing that “we believe that the company is worth more than $15 million.” Exhibit 69. Freund’s “we” referred to Johnson and Rose as well as Freund. These negotiations did not bear fruit.
By 2006, Genitrix was running out of money, and Segal informed the Board that Genitrix would soon be forced to lay off employees. In an email to Johnson’s Board members Freund and Rose dated March 23, 2006, Segal stated, “It is my understanding that applicable law prohibits employing those people beyond the last date for which they can be paid. Furthermore, each employee must be paid the full amount due to him or her on the date of termination ...” Exhibit 28.
Rose responded skeptically, saying,
Please provide me with the legal authority (including any citations) that support your claim that the Board has a legal obligation to lay-off its at-will employees in the near future. Please provide as many specifics as possible so that we can evaluate the purported “legal obligation” that you described below. Also, please let me know whether you have consulted with company counsel or with any other counsel about this alleged obligation, so that we can consult with them. Given the time-sensitive nature of your email, please respond and provide the applicable authority as soon as possible (hopefully today).
Id. About two hours later, Segal responded with an email citing the Wage Act and explaining his interpretation of that law. Id.
Genitrix escaped its immediate financial crisis when Johnson’s company Fisk Ventures agreed to make, and the Genitrix (by its Board) agreed to accept, capital contributions to Genitrix that could only be used for specified purposes. Fisk Ventures made, and Genitrix accepted, a series of such specific-purpose contributions, worth hundreds of thousands of dollars, over a lengthy period of time.
Genitrix stopped paying Segal’s wages in January 2007. Although Fisk Ventures routinely made specific-purpose capital contributions to Genitrix to allow Genitrix to pay other ongoing expenses, including the compensation of employees other than Segal, Fisk Ventures never made any such contribution to cover Segal’s wages, even though Segal complained that he was not being paid. See, e.g., Exhibit 29. Nonetheless, Segal continued to work for Genitrix, because Genitrix was the vehicle which was moving his research forward, and because Genitrix owned the intellectual property portfolio he had developed, and Segal saw value in that intellectual properly and wanted to preserve it. The Board never took any action to terminate Segal’s employment, either with or without cause.
Sometime in 2007, financial difficulties forced Genitrix to discharge Dr. Elihu Young, a scientist who had worked for Genitrix for a decade and was then its only remaining scientific employee (except for Segal himself, who apparently was not working in the laboratory). Rose believed Young to be essential to the success of Genitrix, characterizing him as the only person who knew how to create the molecule that Genitrix was hoping to commercialize. Young contended that Genitrix had not paid him all of the wages he earned before he was laid off. Negotiations with Young ensued, but were unsuccessful. On February 21, 2008, Young sent an email to the Genitrix Board in which he threatened to begin the process of filing a Wage Act claim by giving the required statutory notice to the Attorney General. Exhibit 70 at 2.
*460 There followed a series of emails between Segal and Rose, with copies to the other Genitrix Board members, about the terms of a possible Payment Agreement with Young. In the course of those negotiations, Segal expressed concern that Young might have a “side agreement” with the Johnson/Rose faction on the Genitrix Board. Id. at 4. The record contains no response from Rose or any other Johnson-appointed Board member to Segal’s expressed concern.
On March 18, 2008, Young signed a Payment Agreement with Genitrix, simpler in form than the draft that Segal had proposed and debated with Rose. See Exhibit 6, final page. Segal signed the Payment Agreement on behalf of Genitrix. In this agreement, Young acknowledged that he had ceased being an employee of Genitrix no later than June 30, 2007; Genitrix agreed to pay Young $16,153.83 for work performed during May and June 2007; and Young released Genitrix and its Board members from for all claims for employment-related compensation or benefits. The parties specifically agreed that the Board representatives, including Segal and Rose, were third-party beneficiaries of this release. Although Segal had proposed to Rose and the other Board members that the agreement with Young include a noncompetition agreement, see Exhibit 70 at 1, the signed Payment Agreement did not include such a provision. As was by then the usual practice as to any Genitrix expense, Fisk Ventures agreed to make, and Genitrix agreed to accept, a capital contribution for the sole purpose of making this payment to Young and paying the associated payroll taxes. Exhibit 6 at 1.
By 2008, Segal was the only remaining employee of Genitrix. His primary function was to protect the intellectual property of Genitrix, by filing patent applications and by responding to Office Actions in which the United States Patent and Trademark Office requested information or suggested that the patent applications might not be allowable, and by making annual filings and paying fees in the United States and various other countries to keep existing patents alive, and by dealing with the intellectual property lawyers retained by Genitrix. Rose (and, through him, Johnson) was aware of these efforts through regular email contact with Segal; indeed, Johnson’s company Fisk Ventures made specific-purpose capital contributions or loans at the request of Rose to pay the filing fees and the associated legal fees.
In 2007, Fisk Ventures, as one of the owners of Genitrix, filed a petition for dissolution of Genitrix in Delaware Chancery Court. Eventually that court appointed a Liquidator, and eventually that Liquidator sold the assets of Genitrix in an auction. The liquidation of Genitrix was a very lengthy process, among other reasons because of continuing litigation in Delaware between Segal and the Johnson/Rose interests.
At the auction, the only bidder was a company called OpSaniTx. That company is owned in principal part by Fisk Ventures, which is owned primarily by Johnson, although Rose has at least some ownership interest in Fisk Ventures. Rose manages Fisk Ventures for Johnson.
OpSaniTx acquired all of the intellectual property of Genitrix for $300,000. At the time of or shortly after its acquisition of the Genitrix intellectual property, OpSani-Tx retained Dr. Elihu Young, the long-time scientific employee of Genitrix, as an employee or consultant. After the auction, the Delaware courts liquidated Genitrix.
The $300,000 paid by OpSaniTx for the intellectual property of Genitrix was the only substantial asset of the liquidation estate of Genitrix. The Liquidator paid most or all of the $300,000 in proceeds from the OpSaniTx purchase of the intellectual property to Fisk Ventures, the corporate parent of OpSaniTx, to repay loans that Fisk Ventures had made to Genitrix over the last few years of its corporate life. As a result, the owners of Genitrix, including Segal, Rose, Johnson, and Fisk Ventures, received nothing in the liquidation for their ownership interests.
Rulings of Law
The jury has already found a Wage Act violation, and has found that Johnson and Rose are personally liable to Segal for his unpaid wages as “officers or agents having the management” of Genitrix. The jury has also awarded damages for the Wage Act violation.
Because of the amendment to the Wage Act effective as of July 12, 2008, treble damages are mandatory as to the wages of $167,642 that, according to the jury’s verdict, went unpaid on or after that date. The Wage Act damages that went unpaid before that date, which the jury found to be $231,250, are to be trebled if the defendant’s conduct was “outrageous, because of the defendant’s evil motive or his reckless indifference to the rights of others.” Wiedman v. The Bradford Group, Inc., 444 Mass. 698, 710 (2005), quoting Dartt v. Browning-Ferris Industries, Inc. (Mass.), 427 Mass. 1, 17a (1998).
The only question before me at this stage of the litigation is whether the evidence described in my Findings of Fact meets the standard of Wiedman. I find that it does, and therefore will treble the jury’s award of damages for the period before July 12, 2008 (as well as the period including and after that date, as to which trebling is mandatory).
One factor relevant to the propriety of awarding treble damages is whether the employer (or the officer or agent having the management of the employer, in this case) was aware of the legal obligations imposed by the Wage Act. There is no doubt that Rose, in his role as member of the Board and as an agent of Johnson, became aware of the Wage Act, and the obligations of an employer under that law, in March 2006, when Segal informed Rose of the existence of the Wage Act, gave him the citation for the law, and described his understanding of the obligations it imposed. Two years later, Rose was deeply involved in negotiations about compensation due and owing to Young, in which Young specifically threatened that he *461 would file a statutory notice under the Wage Act with the Attorney General. I rule that Defendants were well aware that Genitrix had an obligation to pay Segal’s wages, and that there were consequences, including possible personal liability of certain actors, if it did not.
Defendants’ arguement, though, is that Defendants had no reason to believe that they faced personal liability, given that the Wage Act refers to individual liability only of officers or agents having the management of a traditional business corporation, and Genitrix was a limited liability corporation. This argument is unavailing. While Defendants are correct that the Supreme Judicial Court did not rule that officers or agents having the management of a limited liability corporation could be personally liable under the Wage Act until Cook v. Patient EDU, LLC, 465 Mass. 548 (2013), that ruling was hardly a surprise, given that any other result would have left all employees of any failed limited liability corporation without a Wage Act remedy. In addition, Superior Court judges had been ruling pre- Cook that the personal liability provisions of the Wage Act applied to limited liability corporations. See, e.g., McCarthy v. D’Agostino, Middlesex Sup.Ct. C.A. No. 2012-3336-H (December 17, 2012); Keefe v. Enterprise Associates, LLC, Suffolk Sup.Ct. C.A. No. 2011-13-G (June 12, 2012) [30 Mass. L. Rptr. 394].
The primary factor relevant to whether pre-July 12, 2008 Wage Act damages should be trebled, teaches Weidman, is the outrageousness of the conduct of Defendants, resulting from “evil motive” or “reckless indifference to the rights of others.” 444 Mass. at 710. Here, when Defendants entered into their relationship with Segal, they valued the intellectual property that he brought to the venture at $500,000. It is undisputed that Segal grew this intellectual property over the ensuing years, by advancing the research and by obtaining the protection of additional patents, and by keeping those patents alive even as Genitrix was failing. When Segal attempted to buy out the interests of Johnson and Rose and Fisk Ventures in 2006, a Board member appointed by Johnson told Segal in writing that “we believe that the company is worth more than $ 15 million and so do you.” Exhibit 69 at 3. Rose received a copy of this email, id. at 1, and said nothing to the contraiy in response.
A year later, Johnson’s entity Fisk Ventures, as an owner of Genitrix, filed a petition to liquidate it in the Delaware Chanceiy Court, because the parties were unable to agree on its future. The court-appointed Liquidator obtained only $300,000 for the intellectual property of Genitrix.
It is significant that the entity that purchased the Genitrix intellectual property at this potentially-bargain price was owned by Fisk Ventures, which was owned by Johnson and managed by Rose, who also had an ownership interest. Furthermore, Fisk Ventures effectively acquired the intellectual property for free, because the money its subsidiary OpSaniTx paid to the Liquidator was then largely paid to Fisk Ventures to repay loans it had made to Genitrix. As result, Segal’s ownership interest in Genitrix was worth nothing, and he lost—to Fisk Ventures, the creature of Defendants Johnson and Rose—the value of the intellectual property he brought to the venture in 2003 and had grown since that time. There might be many reasons why intellectual property valued at $15 million in 2006 could be worth almost nothing a few years later, but Defendants presented no evidence on that subject at trial, either before me in the second phase of the trial or in the eight days of the jury trial.
One more fact is suggestive of evil motive. Rose was well aware of the importance of Young, the scientist laid off by Genitrix in 2007, to the advancement of the intellectual property; only Young knew how to “make the molecule,” Rose believed. During the three-way negotiations (between Segal, Young, and Rose on behalf of the Johnson interests) to resolve Young’s own Wage Act claim against Genitrix, Segal suggested that Young be required to sign a noncompetition agreement, and that Young be forced to disclose whether he had any side deals with members of the Genitrix Board such as Rose. Rose managed to keep both of those provisions out of the final version of the Payment Agreement between Genitrix and Young. Then, either before or shortly after Fisk Venture’s affiliate OpSani-Tx acquired the Genitrix intellectual property in the liquidation, Young went to work for OpSaniTx.
A noncompetition agreement with Young would likely have expired by the time Young went to work for OpSaniTx, and might not have been enforced by an about-to-be-dissolved Genitrix in any event. But, because no one knew how long Genitrix had left to live, no one knew this when Rose argued that no noncom-petition agreement with Young was necessary, and when he declined to respond to Segal’s concern about side deals between Young and any Board member.
Johnson and Rose also argue that a court-appointed Liquidator carried out an auction, which he advertised to many people and entities who might have an interest in this particular type of intellectual property, and no one bid except OpSaniTx. I agree that the auction process permitted others who saw value in the Genitrix intellectual property to bid for that property, and they did not. But it should not be surprising that the people who were intimately familiar with the intellectual property, having owned it and grown it for manyyears, were the most likely bidders. One of those people, Segal, had no money to make a bid, because he had not been paid his wages for a period of years, as Johnson and Rose well knew. Even using the auction format, Johnson and Rose were well-positioned to take advantage of their superior knowledge of the value of the intellectual property. The fact that they retained former Genitrix scientist Young as soon as they acquired the intellectual property suggests that they believed that the intellectual property contributed and grown by Segal had real value.
*462 Johnson and Rose also argue that I cannot consider this evidence as to the question of the trebling of Wage Act damages because of the doctrine of the law of the case. They cite Judge Roach’s Memorandum and Order on Defendants’ Motion to Dismiss for Failure to State a Claim dated March 5, 2010, pointing to one paragraph in which she dismissed counts alleging that various Defendants engaged in a conspiracy to deprive Segal of his intellectual property rights, because he had raised and then dismissed conspiracy claims in the Delaware litigation. Certainly Judge Roach’s decision would prevent Segal from reviving a claim for damages for conspiracy here, as would Segal’s decision to raise and then dismiss conspiracy counts in Delaware. However, Segal is not making a new damages claim here; instead he is citing evidence that might have supported a conspiracy claim, if it were still alive, for a completely different purpose, to assist me in deciding whether to treble damages he has been awarded on a completely different theory. The doctrine of the law of the case does not prevent him from doing so.
For these reasons, I rule that Segal has carried his burden of proving that the conduct of Defendants Johnson and Rose was “outrageous, because of the defendant’s evil motive or his reckless indifference to the rights of others.” Wiedman, 444 Mass. at 710. Therefore the damages awarded by the jury for Wage Act violations prior to July 12, 2008 shall be trebled.
Conclusion
The jury awarded single damages of $398,892. Plaintiff Segal is to be awarded damages of three times that amount, jointly and severally against Defendants Johnson and Rose.